# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) LISA WEST, and | ) | |
| (2) STORMY HOPSON, | ) | |
| Individually and as Class Representatives, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-16-00264-F |
| | ) | |
| (1) CHAPARRAL ENERGY, LLC, | ) | |
| (2) FAIRFIELD OIL & GAS CORP., | ) | |
| (3) GUINN COMPANY, | ) | |
| (4) HEMBREE A. W. COMPANY, | ) | |
| (5) LEASEHOLD MANAGEMENT CORP., | ) | |
| (6) NEW DOMINION, LLC, | ) | |
| (7) NEWELL OIL AND GAS, LLC, | ) | |
| (8) OKLA. OIL & GAS MANAGEMENT, INC., | ) | |
| (9) PHOENIX OIL & GAS, INC., | ) | |
| (10) BILLY JACK SHARBER OPERATING, LLC, | ) | |
| And | ) | |
| (11) TRANSPRO ENERGY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' COMBINED RESPONSE TO
## DEFENDANTS' MOTIONS TO DISMISS

---

Edward L. White, OBA #16549
Kerry D. Green, OBA #31998
Edward L. White, P.C.
829 East 33rd Street
Edmond, Oklahoma 73013
Telephone: (405) 810-8188
Facsimile: (405) 608-0971
Email: ed@edwhitelaw.com
     kerry@edwhitelaw.com

Ray Maples, OBA #18586
Glendell Nix, OBA #13747
Maples, Nix & Diesselhorst, PLLC
15401 North May Avenue
Edmond, Oklahoma 73013
Telephone: (405) 478-3737
Facsimile: (405) 513-5005
Email: ray@mndlawfirm.com
     glendell@mndlawfirm.com

November 3, 2017

***ATTORNEYS FOR PLAINTIFFS***

# TABLE OF CONTENTS

I. Introduction......................................................................................1

    A. Summary of Plaintiffs' Claims and Their Procedural Posture ...........1

    B. The Issue Before the Court is Whether Plaintiff's Have
        Sufficiently Plead Specific Causation................................................2

II. Summary of Relevant Allegations .....................................................5

    A. The Scientific Basis for Plaintiffs' Claims is Indisputably
        Sound, and the Causal Link Between Specific Injection
        Wells and Earthquake Swarms Has Already Been Shown ...............5

    B. Allegations Showing Individual Defendants' Causal Link
        To Individual Harms Suffered by Named Plaintiffs..........................6

    1. Defendant Chesapeake.........................................................6

    2. Defendant Devon Energy.....................................................7

    3. Defendant EastOk ...............................................................8

    4. Defendant Equal Energy ......................................................8

    5. Defendant Fairfield .............................................................9

    6. Defendant New Dominion ..................................................10

    7. Defendant Okla. Oil & Gas Mgmt. ("OOGM") ....................11

    8. Defendant Phoenix Oil & Gas ............................................12

    9. Defendant Transpro Energy ................................................12

    10. Defendant White Star Petroleum ........................................13

    11. Defendant Range Production Co., LLC ................................14

III. Standard Applicable to the Pending Motions to Dismiss .................15

    A. What "Plausible" Really Means Under *Twombly* and *Iqbal* .................15

B.  Plaintiffs Do Not Have to "Prove" or "Establish" Their Claims Now, But Must Only Plead Facts to Rendering the Interfreence of Liability Plausible ...............................................................16

C.  The Presence of Multiple Defendants and the Nature of the Claims Does Not *Per Se* Render This Case Too Complicated To Try ...................................................................................20

IV.  Plaintiffs Plausibly Pled Causation.................................................23

A. General Causation Has Been Sufficiently Plead ....................................23

B.  Specific Causation Has Also Been Sufficiently Plead ...........................23

1.  Plaintiffs Are Not Required to Establish Specific Wells Caused A Particular Earthquake or Swarm, Though Plaintiffs Made That Type of Allegations.........................................................................25

2.  Plaintiffs Are Not Required to Establish a Particular Fault Caused A Particular Earthquake ................................................................27

3.  Defendants Have Done More than Merely Create a "Condition" that Risks Harm to Plaintiffs ................................................................30

V.  Plaintiffs Have Sufficiently Plead Available Damages ...................................31

A. Plaintiffs Can Recover for Damages That Occurred Before they Owned the Real Property at Issue ......................................................33

B.  Plaintiffs May Recover Insurance Premiums in Addition to other Damages............................................................................35

VI.  Conclusion ......................................................................39

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
    556 US. 662 (2009) .............................................................................. 16, 20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 15, 16, 20

*Billy v. Tex., O. & E.R. Co.*,
    1953 OK 280, 263 P.2d 187 ......................................................................30

*Brennen v. Aston,*
    2003 OK 91, 84 P.3d 99 .............................................................................36

*Briscoe v. Harper Oil Co.*,
    1985 OK 43, 702 P.2d 33 ...........................................................................22

*British-American Oil Producing Co. v McClain*,
    1942 OK 89, 126 P.2d 530 .................................................................. 25, 27

*Case v. Fiberboard Corp.*,
    1987 OK 79, 743 P.2d 1062 .......................................................................31

*City of Holdenville v. Kiser*,
    1937 OK 29, 64 P.2d 1223 .........................................................................35

*Denco Bus Lines, Inc. v. Hargis*,
    1951 OK 11, ¶ 11, 229 P.2d 560 ................................................................36

*Estrada v. Port City Properties*, Inc.,
    2011 OK 30 ¶ 35, 258 P.3d 495, 508 .........................................................36

*Fischer v. Atlantic Richfield Co.*,
    774 F. Supp. 616 (W.D. Okla. April 17, 1989) ................................... 33, 34

*Jag Trading, L.L.C. v. LSB Indus.*,
    2013 U.S. Dist. LEXIS 195680, at *2-4
    (W.D. Okla. Mar. 11, 2013) .......................................................................16

*Kan. Penn. Gaming, LLC v. Collins*,
    656 F.3d 1210 (10th Cir. 2011) .................................................................21

*Khalik v. United Air Lines,*
    671 F.3d 1188 (10th Cir. 2012) ........................................................20

*Ladra v. New Dominion, LLC,*
    2015 OK 53, 353 P.3d 529 ...........................................................22

*McDonald v. Wise,*
    769 F.3d 1202 (10th Cir. 2014) ........................................................19

*McKellips v. St. Francis Hosp., Inc.,*
    1987 OK 69; 741 P.2d 467, 470 (Okla. 1987) .............................................17

*Mid-Continent Petroleum Corp. v. Fisher,*
    1938 OK 483, 84 P.2d 483...........................................................22

*Nichols v. Mid Continent Pipe Line Co.,*
    1996 OK 118, 933 P.2d 272........................................................ 22, 34

*Northup v. Eakes,*
    1918 OK 652, ¶ 3, 178 P. 266, 267 ...............................................32

*Northup v. Eakes,*
    1972 OK 66, 178 P. 266.............................................................26

*Okla. City v. Eylar,*
    1936 OK 614, 61 P.2d 649.........................................................35

*Okla. City v. Tytenicz,*
    1935 OK 433, 43 P.2d 747.........................................................35

*Overturff v. Hart,*
    1975 OK 13, 531 P.2d 1035........................................................36

*Phillips Petroleum Co. v. Ruble,*
    1942 OK 93, 126 P.2d 526...................................................... 35, 37

*Phillips Petroleum Co. v. Vandergriff,*
    1942 OK 94, 122 P.2d 1020.................................................... 26, 27

*Ponca Tribe of Indians v. Cont'l Carbon Co.,*
    2008 U.S. Dist. Lexis 123678 n.1,
        (W.D. Okla. November 21, 2008)........................................ 35, 36

*Pub. Serv. Co. of Okla. v. Hawkins*,
194 OK 272, 149 P.2d 783.............................................................36

*Pueblo of Jemez v. US*,
790 F.3d 1143 (10th Cir. 2011) ....................................................21

*Ridge at Red Hawk, L.L.C. v. Schneider*,
493 F.3d 1174, (10th Cir. 2007) ...................................................19

*Robbins v. Okla. ex rel. Dep't of Human Servs.*,
519 F.3d 1242, 1247, 1249 (10th Cir. 2008) ...................... 20, 21, 23, 25, 29

*Schneberger v. Apache Corp.*,
1994 OK 117, 890 P.2d 847................................................ 36, 37

*Sunray DX Oil Co. v. Brown*,
1970 OK 183, 477 P.2d 67.............................................................22

*Tenneco Oil Company v. Allen*,
1973 OK 129, 515 P.2d 1391..........................................................22

*Town of Braggs v. Slape*,
1952 OK 396, 250 P.2d 214...........................................................35

*Town of Sentinel v. Boggs*,
1936 OK 620, 61 P.2d 654.............................................................26

*Truelock v. City of Del City*,
1998 OK 64, 967 P.2d 1183...........................................................35

## Statutes

FRCP:
§8 ............................................................................... 16, 20
§8(a)(2)........................................................................20
§12(b)(6) ....................................................................16
§19 .............................................................................33
§23 .............................................................................33

23 Okla. Stat. §4 .........................................................36
23 Okla. Stat. §61 .......................................................36

## Constitution

Okl. Const. Art. II §6 ......................................................................... 1, 25

## Miscellaneous

RESTATEMENT (SECOND) of TORTS §821D ..................................................35

OUJI 9.1 .................................................................................................4
OUJI 9.2 .................................................................................................4
OUJI 9.8 ...............................................................................................30
OUJI 9.34 .............................................................................................33
OUJI 9.36 .............................................................................................33

COME NOW the Plaintiffs and, pursuant to the Court's Orders entered July 27, 2017 [Doc. 275] and October 2, 2017 [Doc.297], and respectfully submit this Objection and Response to the Common Issues in Defendants' Rule 12 Motions to Dismiss certain claims in Plaintiffs' Second Amended Complaint (hereafter, "SAC").[1] For the reasons stated herein, Defendants' Motions to Dismiss must be denied. In support of this combined Objection and Response, Plaintiffs show the Court the following:

## I. Introduction

### A. Summary of Plaintiffs' Claims and Their Procedural Posture

As with their prior Motions to Dismiss, Defendants' attempt to either distort the true nature of the allegations against them or ignore the factual allegations establishing the legal viability of those claims. Defendants disregard the well-established legal remedies available to Plaintiffs. This case invokes long-standing fundamental principles of tort law. Thus, in reviewing Defendants' Motions to Dismiss, as they relate to Plaintiffs' purely state-law claims, the Court must recognize that Oklahoma's Constitution guarantees a "certain remedy afforded for every wrong and for every injury to person, property, or reputation." Okl. Const. Art. II, § 6. While not an iron-clad social contract, the preference for the existence of a remedy for a wrong is deeply rooted in Oklahoma law.

---

[1] Plaintiffs hereby respond to all the motions to dismiss filed by Defendants in this action including Chaparral Energy, LLC and Range Production Company, LLC [Doc.285]; New Dominion, LLC [Doc.286]; Chesapeake Operating, LLC [Doc.287]; Devon Energy Production Company, LP [Doc.278]; EastOk Pipeline, LLC [Doc.289]; Equal Energy, US, Inc., Fairfield Oil & Gas Corp., and Oklahoma Oil And Gas Management, Inc. [Doc.284]; Phoenix Oil & Gas, Inc. [Doc.282]; SandRidge Exploration and Production, LLC [Doc.281]; and White Star Petroleum, LLC [Doc.279].

In the previous motions to dismiss, Defendants made many of the same underlying arguments and sought to dismiss all of Plaintiffs' claims, including some particularized tort claims. At the hearing on those motions, held on May 12, 2017, the Court *denied* Defendants' motions to dismiss, finding that: 1) Plaintiffs claims are not barred by a statute of limitations; 2) Plaintiffs have sufficiently pled private nuisance claims; 3) Plaintiffs have sufficiently pled claims of an abnormally dangerous activity; 4) Plaintiffs sufficiently pled trespass claims; 5) other than specific causation addressed herein, Plaintiffs have sufficiently pled a negligence claim. [Doc.266, Minute Sheet Entered May 12, 2017][2].

Plaintiffs filed a Second Amended Complaint ("SAC") adding three new sets of Plaintiffs: the Cloyes of Edmond, the Whites of Cushing, and Dell Livsey of Stillwater. Also, the SAC also added specific earthquake-swarm-based allegations regarding each named Defendant other than Range. The new allegations identified specific wells that were primary causes of specific earthquakes, and then the allegations linked that earthquake to harm suffered by one or more specific named Plaintiffs.

---

[2] The Court Granted various Defendants' Motions to Dismiss "challenging the request for injunctive relief" as well as Defendant SandRidge's Motion to Dismiss "to set forth post-effective date torts." *Id.* The issue of "injunctive relief" is now presented by Defendants as part of the certain Motions to Strike Class Allegations and Plaintiffs offer objections and response in the separate brief allowed by the Court by Order dated October 2, 2017 [Doc. 297]. Defendants SandRidge and Chaparral have also moved to dismiss claims based upon their Bankruptcy posture. Plaintiffs' objection and response to the bankruptcy issues will be presented in separate briefing.

## B. The Issue Before the Court is Whether Plaintiffs Have Sufficiently Pled Specific Causation

Given these rulings, the only issue that remains for purposes of the Response to Defendants' Motion to Dismiss is a single element of Plaintiffs' claims, to wit: specific causation. The Court ruled that Defendants' Motions to Dismiss "challenging causation are GRANTED." *Id.*[3] Although the Defendants attack the sufficiency of Plaintiffs' causation allegations from several different angles, the analysis before the Court is simple, to wit: do Plaintiffs factual allegations, taken as true, plausibly establish a viable claim for which Plaintiffs can recover under Oklahoma law? Parsed further, the Court must determine whether Plaintiffs' allegations 1) describe certain actions by Defendants (wastewater injection), 2) that could plausibly cause the harm alleged by Plaintiffs, and finally, 3) have Plaintiffs alleged that those certain actions by certain Defendants did cause harm to certain Plaintiffs.

Instead of acknowledging the fundamental questions, Defendants attempt to paint this case as a legal unicorn that is so unusual and unprecedented that it could not possibly move forward. The only thing unusual about this case, however, are Defendants' unprecedented actions causing an earthquake swarm unlike anything ever encountered in human history. While the factual background is unique, the goal of seeking remediation for conduct which wrongfully causes harm is most certainly not. Defendants' arguments focus more on the "novelty" of the circumstances; to wit: formerly natural phenomena now

---

[3] The Court also found that although this issue was not presented by all Defendants, "the Court concludes the ruling should apply to all defendants." *Id.*

induced by *intentional* human activity. Defendants also offer a bold misconstruction of the relief sought by Plaintiffs, suggesting there is no established or potential remedy for them. In crafting an appropriate remedy, Plaintiffs have not strayed from longstanding precedent; they have only asked for the most appropriate and reasonable remedies given the circumstances.

Plaintiffs have presented a prima facie case for recovery in tort. Negligence is commonly defined as "the failure to exercise ordinary care to avoid injury to another's person or property." OUJI 9.2. *A fortiori,* each person has a duty to *not* injure another's person or property. The elements of actionable common negligence which follow that definition are, 1) that one owes a duty to another; 2) that one breached that duty; 3) that the other has sustained injury; and 4) that the negligence or breach of duty was a direct cause of the injury by the claiming party. OUJI 9.1.

This case is no more legally mystical than many other cases. However, the scope of harm being wrecked upon Oklahomans as a result of Defendants' wastewater injection is grand and unique. The potential risk of harm to property – and life – in the State of Oklahoma has risen to a level that is potentially catastrophic. The claims alleged, and remedies sought, by the Plaintiffs are structured such that they are fair remedies for the actual harm created by Defendants' actions, to wit: the damages to property, an increase in the *risk* of significant damage to property, and diminution in property values. Given the scientific bases offered and acknowledged by the Court at the May 12, 2017 hearing, there is nothing speculative about the connection between wastewater injection and the increased risk of earthquakes and resulting harm.

That much is plausible. I grant you that. And I really don't think that much is really in controversy, that there is a connection, at a minimum, an association, and I think most people would even concede causation, between as a general proposition the injection to the Arbuckle formation and seismic activity.

Hearing Transcript, [Doc. 267, p. 59, lns 4-9].

The gravaman of the pending motions is whether Plaintiffs have sufficiently alleged *specific* causation against the moving Defendants. That, is, have Plaintiffs amended their claims to describe what actions each Defendant took that caused harm to a certain plaintiff or plaintiffs? A review of the SAC shows that Plaintiffs have accomplished this, and more.

## II. Summary of Relevant Allegations

### A. The Scientific Basis for Plaintiffs' Claims Is Indisputably Sound, and the Causal Link Between Specific Injection Wells and Earthquake Swarms Has Already Been Shown

"[The] majority of recent earthquakes in central and north-central Oklahoma are very likely triggered by the injection of produced water in disposal wells." [SAC ¶ 57 (quoting the Okla. Sec. of Energy and Environment)]. "'Wastewater injection,' says Bill Ellsworth, a seismologist at the USGS, 'is undoubtedly responsible for the majority of these earthquakes.'" [SAC ¶ 13]. "I don't know what to say frankly. It's incredible. I've never seen anything like it in the world," said Daniel McNamara, a research geophysicist with the USGS. He went on to note that "after decades of wastewater injection…a fault system throughout Oklahoma…[is] critically stressed." [SAC ¶ 59]. The EPA also agrees that injection causes earthquakes. [SAC ¶ 56].

Scientists have already established a causal link between specific injection wells and specific earthquakes such as the Prague and Fairview swarms [SAC Ex. 13, 16 and ¶¶

55, 73, 91]. In the case of Fairview, the wells causing that MM 5.1 were as much as 20 or even 30 km away from the epicenter. [SAC Ex. 16, p.2 (figure at the top of the page shows the "high-rate injection zone" with the cluster and the MM 5.1 earthquake and the distances can be seen by reference to the scale shown on the map).

### B. Allegations Showing Individual Defendants' Causal Link to Individual Harms Suffered by Named Plaintiffs

For all Defendants other than Range, Plaintiffs allege that the specific defendant injected through specific well(s) causing a specific earthquake which damaged specific plaintiff(s). For Range, no specific well was identified, nor was causation of a specific earthquake alleged.[4]

**1. Defendant Chesapeake** operates more than 30 wells in Western Oklahoma including Campbell 1, Dutch Harbor 1-14, and Mississippi 1 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 16, 18, and 92]. In "response to past [earthquake] activity, but also to get out ahead of it and hopefully prevent new areas from being involved," the Oklahoma Corp. Comm. "OCC" required reduction of rates or monitoring of 36 wells operated by Chesapeake. [SAC Ex. 1, pp. 1, 5, and 62]. Chesapeake's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise of special interest. [SAC ¶ 92]. Chesapeake primarily caused the Fairview / Cherokee earthquake swarm occurring November 2015 – February 2016 and

---

[4] Plaintiffs can make such specific allegations for Rangew, and seek leave of the Court to do so, if the Court is otherwise inclined to dismiss that Defendant. However, retention of Range as a putative member of the Defendatns class should eliminate the need for a third amended complaint if this is the only issue militating in favor of another amendment.

including a MM 5.1 earthquake by their wastewater injections via a mechanism of far-field pressurization that damaged Plaintiff Cloyes' and the class' real and personal property in the area and interfered with their use and enjoyment of real property. [SAC ¶¶ 34, 90-94, and Ex. 16]. The Fairview / Cherokee swarm caused shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Edmond, Stillwater, and Cushing. [SAC at Fig. 15].

    2.    **Defendant Devon Energy** operates 54 wells in Central Oklahoma including LP, Harvey 1-11, Vonda 1-6, Evenson 1, Adkisson 1-33, Frank 1-33, Lena 1, Dudek 1, Hopfer 1-20, Fuxa 1, and Wilma 1-16 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 19and 81]. Devon injected nearly 170 million barrels of wastewater into the Arbuckle formation, the most for any operator, for 2014 and 2015. [SAC ¶ 19]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring 54 wells operated by Devon. [SAC Ex. 2, pp. 7 and 15]. Devon's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶81 and 86]. Devon's wastewater injection primarily caused the Edmond (Dec. 2013) and Crescent (Nov. '15 – Mar. '16) earthquake swarms that damaged Plaintiff Cloyes', Livsey's and the class' real and personal property and interfered with the use and enjoyment of real property. [SAC ¶¶ 80-83 and 85 - 89]. The Edmond earthquake swarm caused MM 4 shaking in multiple Oklahoma cities including Hugo Oklahoma, approximately 151 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 15, pp.15]. Additionally, The Crescent earthquake swarm caused

shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Edmond, Hennessey, and Stillwater. [SAC at Fig. 14].

3.      **Defendant EastOk** operates nine wells in Central Oklahoma including EastOk 1-24, Drummond 1-19, and Palm 1-12 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 20, 95, and 96]. EastOk injected nearly 29 million barrels of wastewater into the Arbuckle formation for 2014 and 2015. [SAC ¶ 20]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates and monitoring of nine wells operated by EastOk. [SAC Ex.2, pp.7 and 15]. EastOk's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 96]. EastOk's wastewater injection primarily caused the Pawnee earthquake swarms in September 2016 that damaged Plaintiff Cloyes' and the class' real and personal property and interfered with their use and enjoyment. [SAC ¶¶ 95-100]. The Pawnee earthquake swarm caused shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Oklahoma City, Shawnee, Tulsa, and Broken Arrow. [SAC at Fig. 18].

4.      **Defendant Equal Energy** operates 17 wells in Central Oklahoma including Twin Cities #2 and #3 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 21 and 72]. Equal injected nearly 51 million barrels of wastewater into the Arbuckle formation from 2014 and 2015. [SAC ¶ 21]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of 17 wells operated by Equal Energy. [SAC Ex. 2, pp.7 and 15]. Equal's injection activities place

them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 72]. Equal's wastewater injection primarily caused the Prague (Nov. – Dec. 2011) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶¶ 71-77]. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne, Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 15, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas,Texas and as far away as Erie PA, a mere 1,008 miles. [SAC Ex. 14, pp.164 and at Fig. 10].. [Sac at Fig. 10]

5.      **Defendant Fairfield** operates at least one injection well, MG #5, in Pottawatomie County injecting wastewater into the Arbuckle formation. [SAC ¶¶ 22 and 72]. Fairfield injected nearly 5.4 million barrels of wastewater into the Arbuckle formation for 2012 to 2014. [SAC ¶ 22]. Fairfield's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 72]. Fairfield's wastewater injection primarily caused the Prague (Nov. – Dec. 2011) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶ 31-33and 71-77]. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and

enjoyment of real property. [SAC Ex. 14, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas, Texas and as far away as Erie PA, 1,008 miles. [SAC at Fig. 10 and Ex. 14, pp 164].

6.     **Defendant New Dominion** operates at least one injection well in Pottawattamie County injecting circa 15.6 million barrels of wastewater into the Arbuckle formation from 2012 to 2014 [SAC ¶ 23]. Additionally, New Dominion operates ten wells in Central Oklahoma including Coral SWD #1-26, Turner #1, North Paradigm #1, Wishon #1, Luther #2, and Sweetheart #1 injecting wastewater into the Arbuckle formation. [SAC ¶ 23, 72, and 81]. New Dominion injected just over 113 million barrels of wastewater into the Arbuckle formation for 2014 and 2015. [SAC ¶ 23]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of ten wells operated by New Dominion. [SAC Ex. 2, pp. 7 and 16]. New Dominion was the second-largest injector, injecting a volume more than double the second-highest injector, and injected more than five times as much volume. [SAC Ex. 2, pp. 15-17]. New Dominion's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 72 and 81]. New Dominion's wastewater injection primarily caused the Prague (Nov. – Dec. 2011) and Edmond (Dec. 2013) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's, Cloyes', and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶¶ 71-77 and 80-84]. The Edmond earthquake swarm caused MM 4 shaking in multiple Oklahoma cities including Hugo Oklahoma, approximately 151 miles away that interfered with other named Plaintiffs' and

class members use and enjoyment of real property. [SAC Ex. 15, pp.15]. Additionally, the Oklahoma City Metro area experienced at least MM3 severe shaking. [SAC at Figure 13]. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 14, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas and Texas. [SAC at Fig. 10]

7. **Defendant Okla. Oil & Gas Mgmt. ("OOGM")** operates at least one injection well in Pottawattamie County in Central Oklahoma, Injection Well #10-3 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 24 and 81]. OOGM injected circa 10.8 million barrels of wastewater into the Arbuckle formation from 2012 to 2014. [SAC ¶ 24]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of wells in the area of interest. [SAC Ex. 2 pp. 7]. OOGM's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 81]. OOGM's wastewater injection primarily caused the Edmond earthquake swarms in December 2013 that damaged Plaintiff Cloyes' and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶¶ 80-84]. The Edmond earthquake swarm caused MM 4 shaking in multiple Oklahoma cities including Hugo Oklahoma, approximately 151 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 15,

pp.15]. Additionally, the Oklahoma City Metro area experienced at least MM3 severe shaking. [SAC at Figure 13].

8. **Defendant Phoenix Oil & Gas** operates at least two wells in Central Oklahoma including Youngblood #2 and Girard #1 injecting wastewater into the Arbuckle formation. [SAC ¶ 25 and 72]. Phoenix injected circa 56.7 million barrels of wastewater into the Arbuckle formation from 2012 and 2014. [SAC ¶ 25]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of wells in the area of interest. [SAC Ex. 2 pp. 7]. Phoenix injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 72]. Phoenix's wastewater injection primarily caused the Prague (Nov. – Dec. 2011) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶¶ 71-78]. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 14, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas and Texas. [SAC at Fig. 10]

9. **Defendant Transpro Energy** operates at least one well, Davis #1-21, in Central Oklahoma injecting wastewater into the Arbuckle formation. [SAC ¶ 28 and 72]. Transpro injected circa 6.4 million barrels of wastewater into the Arbuckle formation from 2012 and 2014. [SAC ¶ 28]. Transpro injection activities place them in the upper quartile

of injection well disposal volume, within 10 miles of an earthquake or otherwise special interest. [SAC ¶ 72]. Transpro's wastewater injection primarily caused the Prague (Nov. – Dec. 2011) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶ 71-78]. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 14, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas and Texas. [SAC at Fig. 10]

      10. **Defendant White Star Petroleum** operates 22 wells throughout Oklahoma including Doberman #1-25 SWD, Lena 15-19N-3W #1SWD, Dudek 12-18N-3W #1, Elaine 10-18N-2W #1SWD, White Star Petroleum LLC, Leigh 8-19N-3E #1 SWD, Gilbert #1-17 SWD, Shenold #25-1 SWD, Louis #6-3, Bontrager 1-21X, Buffington 1, Cedar Grove 1, Daddy Don 1-30, Dallas 1-6, Gilbert 1-17, H. Voise 1, Newton 1-7, Rains 1, Thomason 1, Vargas 1, Vitek 1-24, Voise 1-10, Wiseman 1, White Star Petroleum LLC, Calyx 35-2, Wilson 11-15, Etheridge 35-2, Hill #29-1SWD, Ethridge #25-3, Williams 5-1, HC Ryan 15-18N-6E #1, and Daddy Don #1-30 SWD injecting wastewater into the Arbuckle formation. [SAC ¶¶ 29, 72, 86, 96, and 103]. White Star injected over 39 million barrels of wastewater into the Arbuckle formation for 2014 and 2015. [SAC ¶ 29]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of 22 wells operated by White Star. [SAC Ex. 6, pp.3]. White Star's injection activities place them in the upper quartile of injection well

disposal volume, within 10 miles of an earthquake or otherwise of special interest. [SAC ¶¶ 72, 86, 96, and 103]. White Star primarily caused the Prague (Nov. – Dec. '11), Crescent (Nov. '15 – Mar. '16), Pawnee (Sep. '16), and Cushing (Nov '16) earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's, Cloyes', Whites' and the class' real and personal property and interfered with their use and enjoyment of real property. [SAC ¶¶ 71-79, 85-89, 95-100, and 101-105]. White Star wastewater injection activities will be forever known for causing the largest Oklahoma earthquake in history, the Pawnee earthquake. The Prague earthquake swarm caused MM 3 shaking in multiple Oklahoma cities including Laverne Oklahoma, approximately 200 miles away that interfered with other named Plaintiffs' and class members use and enjoyment of real property. [SAC Ex. 14, pp.68 and at Fig. 10]. The shaking was so severe it was felt in the surrounding states Kansas, Missouri, Arkansas and Texas. [SAC at Fig. 10]. The Crescent earthquake swarm caused shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Edmond, Hennessey, and Stillwater. [SAC at Fig. 14]. The Pawnee earthquake swarm caused shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Oklahoma City, Shawnee, Tulsa, and Broken Arrow. [SAC at Fig. 18]. The Cushing earthquake swarm caused shaking in multiple Oklahoma cities sufficient to interfere with other named Plaintiffs' and class members property including in Guthrie, Stillwater, and Stroud. [SAC at Fig. 20].

11.     **Defendant Range Production** operates 16 wells in Central and Western Oklahoma injecting wastewater into the Arbuckle formation [SAC ¶ 26]. Range injected

nearly 71 million barrels of wastewater into the Arbuckle formation for 2014 and 2015. [SAC ¶ 26]. To "reduce the risk of earthquakes potentially triggered by saltwater disposal wells," the OCC required reduction of rates or monitoring of 16 wells operated by Range. where Range's wells have one of the highest per-well injection rates at more than twice the average rates for wells in the advisory, coming in behind New Dominion. [SAC Ex. 2, pp.16]. Range Production injection activities place them in the upper quartile of injection well disposal volume. [SAC ¶ 16 and Ex. 2, pp. 16].

Range Production's wastewater injection primarily caused four earthquake swarms that damaged Plaintiff West's, Hopson's, Livsey's, Cloyes', Whites' and the class' real and personal property and interfered with their use and enjoyment of real property.

While there is no named Plaintiff associated for the Crescent Earthquake currently, Plaintiffs Cloyes, and Livsey likely suffered damaged from the Crescent earthquake primarily caused by Range Production as can be seen in the shake map, Figure 14. [SAC 88].

## III.    Standard Applicable to the Pending Motions to Dismiss

### A. What "Plausible" Really Means under *Twombly* and *Iqbal*[5]

As mentioned above, Defendants mischaracterize the SAC as having added little in the way of *causation* to show "plausibility." In doing so, Defendants ignore the myriad of scientific facts added to the SAC in the hope that the Court will do the same. Instead, the Court must carefully review the allegations set forth in the SAC, as summarized above,

---

[5] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

and determine if those allegations – taken as true – establish a *plausible* claim for relief against Defendants. Defendants misconstrue a pleading standard under *Iqbal* and *Twombly* then they allege Plaintiffs cannot meet this inaccurate standard. But this Court has accurately recited the standard:

> Rule 8…requires "a short and plain statement of the claim showing that the pleader is entitled to relief."… Nonetheless, a complaint must also be specific enough to give defendants notice of the theory under which their claim is made. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted. . . In assessing whether a claim is plausible, the court must construe the complaint in the light most favorable to the plaintiff and must presume all factual allegations to be true.…To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . .

*Jag Trading, L.L.C. v. LSB Indus.*, No. CIV-12-745-F, 2013 U.S. Dist. LEXIS 195680, at *2-4 (W.D. Okla. Mar. 11, 2013) (citations omitted).

Thus, the analysis under *Twombly* and *Iqbal* is not as far removed from common notions of pleading as Defendants suggest. As the Court notes above, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Plaintiffs Do Not Have to "Prove" or "Establish" Their Claims Now, But Must Only Plead Facts to Rendering the Inference of Liability Plausible

Defendants predominantly argue that Plaintiffs' SAC does not establish causation, either general or specific. Defendants argue this in the context of a motion for summary judgment standard. For example, Defendant Devon argues that "Oklahoma law requires

Plaintiffs to *demonstrate* that Devon's conduct was both "the cause in fact" and the "legal cause" of their injuries or damages. *McKellips v. St. Francis Hosp., Inc.,* 1987 OK 69; 741 P.2d 467, 470. That is, Devon argues that Plantiffs must first *demonstrate* that they would not have suffered their damages "but for" Devon's acts. *Id.* [Doc. 278, p. 5]. Oklahoma law does not apply in this context, but rather federal, and it only requires plausible pleading of fact that, if true, support an inference of the Defendants' liability. In a similar vein, Defendant Phoenix alleges that Plaintiffs must "***conclusively*** establish that Phoenix's actions specifically caused the Prague earthquakes." [Doc. 282, p. 7]. This is certainly an improper burden at the motion to dismiss stage.

Plaintiffs bear the burden of proof at the later stages of this litigation but as thoroughly discussed above, the issue before the Court is whether the language in SAC *plausibly* states a cognizable claim against these Defendants. The Court has already found that Plaintiffs plausibly pled general causation, to wit: that wastewater injection to the Arbuckle is related to seismic activity.

> "That much is plausible. I grant you that. And I really don't think that much is really in controversy, that there is a connection, at a minimum, an association, and I think most people would even concede causation, between as a general proposition the injection to the Arbuckle formation and seismic activity."

Hearing Transcript, [Doc. 267, p. 59, lns 4-9]. Defendant SandRidge at least recognized the allegations in the SAC in this context may be sufficient (with respect to *other* Defendants). "The only thing that can be said for plaintiffs' approach to causation vis-à-vis other Defendants has *some* stated rationale however minute and random." [Doc. 281, p. 5].

Some Defendants, namely Chaparral, Equal Energy, Fairfield Oil & Gas Corp., and Okla. Oil and Gas Mgmt ("OOGM"), hold on to prior arguments that have no vitality in light of the new allegations in the SAC. For example, at the previous hearing, the Court discussed the OCC media advisories Plaintiffs point out in support of their allegations. Defendants quoted the Court, "[i]n my view, the Commission's media advisories are not sufficient to establish the necessary *specific* causal link that must be plausibly pled here." [Doc. 284, p. 2; Doc. 285, p. 14; Transcript Doc. 287, pp. 65-66]. The arguments about the OCC's media advisories disregard the Court's prior statement as well as Plaintiffs' amended allegations.[6] The general scientific consensus and the actions of the OCC are reiterated briefly, not to plead causation, but to set the scene, showing the Court that the alleged causal chain from Defendants' actions to the Plaintiffs' harms is generally plausible. Prior shortcomings have been cured with the detailed and causal allegations in the SAC. Plaintiffs have added allegations that particular injection activity through particular well(s) by each particular defendant caused at least one particular large earthquake. Plaintiffs then alleged that the particular earthquake(s) caused by each particular defendant caused particular harm to specific named Plaintiffs. This is all that is

---

[6] Defendant Chaparral attempted to extrapolate the Court's later statement with respect to the 2011 Prague earthquake. The Court stated, on p. 66 that (with respect to Defendants Guinn, Phoenix, and New Dominion. . .simply injecting wastewater in the wells and being the largest disposal well operators in that county, in my view, is not sufficient to show that they caused the [2011 Prague earthquake]. [Doc. 287, p. 66] Defendant Chaparral overly generalized this by stating the "Court has explained" that being the largest disposal well. . .does not plausibly suggest such operator's activities caused a *nearby* earthquake." [Doc. 285, p. 14]. The Court did not say "nearby," it said "in that county." Injection in many counties could be 50 miles away from an earthquake in that same county.

required, and Plaintiffs have now met their pleading burden for plausibly *alleging* causation.

Many of the cases cited by Defendants in support of their posed pleading standard fail to support a "heightened" standard because the motions to dismiss were granted for lack of *any* cognizable claim available; not necessarily a failure to plead sufficient facts. *See e.g., McDonald v. Wise*, 769 F.3d 1202 (10th Cir. 2014) cited by New Dominion, [Doc. 286, p. 3] where a mayor was fired for alleged sexual harassment, and the court dismissed the claim for violation of his property interest rights finding that he had *no* property interest in his position. Thus, the problem with *McDonald's* claim was not failure to plead sufficient facts, but rather, the lack of a cognizable claim.

Similarly, Sandridge cites *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, (10th Cir. 2007) [Doc. 281, p. 6], where the plaintiff challenged an arbitration order alleging the panel made incorrect rulings of law, including overruling its objections to venue. *Red Hawk* found, however, that the contract allowed a challenge to the award "only if the award 'is based in whole or in part on an incorrect or erroneous ruling of law.'" *Id.* at 1177. The allegations of the plaintiff in *Red Hawk* did "not call into question the merits of the award. The First Amended Complaint leaves the district court with no reason to conclude that the award was 'based in whole or in part on an incorrect or erroneous ruling of law,' so the court correctly held that Ridge failed to state a claim on which relief could be granted." *Id.* at 1178. Again, the problem was the absence of a cognizable claim, rather than failure to plead plausible facts.

Other cases cited by Defendants were obvious in their defects because the plaintiffs pled conclusory elements of a claim with no substantive factual allegations in support. For example, Defendant Devon cites to *Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) [Doc. 278, p. 4], an employment discrimination case which discussed the then "new" or "refined" pleading standards from *Twombly* and *Iqbal*, ultimately finding that:

> Rule 8(a)(2) still lives. There is no indication the Supreme Court intended a return to the more stringent pre-Rule 8 pleading requirements. *See Iqbal*, 129 S. Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . .").

*Id.* at 1191. Despite the clear statement that the pleading standard was *not* dramatically heightened, the Court found *Khalik*'s allegations that she "was born in Kuwait and is an Arab-American. Both of her parents are Palestinian. . .She was physically assaulted in the office (grabbed by the arm) after being subjected to a false investigation and false criticism of her work. She was targeted because of her race, religion, national origin, and ethnic heritage…are the type of conclusory and formulaic recitations disregarded by the Court in *Iqbal*." *Id.* at 1190, 1192. (quoting *Iqbal*, 129 S. Ct. at 1949).

### C. The Presence of Multiple Defendants and the Nature of the Claims Does Not *Per Se* Render This Case Too Complicated to Try

Defendants frequently cite *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242 (10th Cir. 2008) as their touchstone for "plausibility." *Robbins* held that the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1247. *Robbins* failed to point to any specific action or harm correlating to any particular defendant.

[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

*Id.* at 1249-1250. That is what Plaintiffs did in the SAC. *Robbins* relied heavily on the plaintiff's failure to "isolate" the alleged unconstitutional acts of each defendant." *Id.* at 1249. The *Robbins* plaintiff failed to provide "notice" to each defendant as to the nature of each claim against them and instead, lumped the defendants together and simply alleged the defendants caused harm to plaintiffs. *Id.* There was no distinct attribution to defendants and the Court noted it was "impossible" for the individual defendants to ascertain what particular unconstitutional acts each were individually alleged to have committed. *Id.* at 1250. *Robbins* dismissed the complaint, but noted that plaintiff could cure the plausibility defect by providing additional facts to show their grounds for relief. *Id.*

*Robbins* most egregious failure was the blanket allegations that defendants violated the plaintiffs' rights, without explanation or facts as to how any individual defendant social worker caused damages to plaintiffs. Had *Robbins* pled facts specific to each defendant then the complaint would have survived. Here, the SAC puts each specific Defendant on notice as to what action, *i.e.* injecting waste water through particular well(s), caused a particular earthquake that damaged property of a particular plaintiff. The allegations even include details of dates, times, and places related to the allegations; details that would be sufficient to support even the heightened pleading regime for fraud.

Defendant Sandridge cited *Pueblo of Jemez v. US*, 790 F.3d 1143 (10th Cir. 2011) and *Kan. Penn. Gaming, LLC v. Collins*, 656 F.3d 1210 (10th Cir. 2011) for a *context*

argument. [Doc. 281, p. 6]. Defendants' arguments begin with the premise that Plaintiffs simply cannot bring these claims and recover anything because no one has done it before, or they are simply too complicated to litigate. However, there have been legions of cases sounding in tort (including negligence, nuisance, etc.), brought against oil and gas companies for damages caused by oil and gas operations. *See, e.g., Ladra v. New Dominion, LLC,* 2015 OK 53, 353 P.3d 529 (overruling district court's dismissal of plaintiff's claim and ruling the district court had jurisdiction to hear plaintiff's claim that defendant's waste water injection caused earthquakes and damage to plaintiff's property); *Nichols v. Mid Continent Pipe Line Co.*, 1996 OK 118, 933 P.2d 272 (affirming jury verdict for plaintiffs' negligence and nuisance claims that defendants' oil and gas operations damaged plaintiffs' land and cattle); *Briscoe v. Harper Oil Co.*, 1985 OK 43, 702 P.2d 33 (affirming jury verdict for plaintiff landowners for damages to their land caused by the defendants oil and gas operations); *Tenneco Oil Company v. Allen*, 1973 OK 129, 515 P.2d 1391 (affirming jury verdict finding in favor of plaintiff landowners based on nuisance cause of action that oil and gas operations damaged plaintiffs' land); *Sunray DX Oil Co. v. Brown*, 1970 OK 183, 477 P.2d 67 (affirming jury verdict for plaintiff landowners that defendants' oil and gas operations caused thirty-one separate leaks of salt water and oil from different pipelines of defendants that caused damage to their land); and *Mid-Continent Petroleum Corp. v. Fisher*, 1938 OK 483, 84 P.2d 483 (affirming jury verdict in favor of landowner regarding his nuisance action against oil and gas company that allowed oil sediments to pollute a creek that overflowed onto plaintiff's land causing damage).

## IV. Plaintiffs Have Plausibly Pled Causation

### A. General Causation Has Been Sufficiently Pled

Defendants' wastewater injection very likely caused Oklahoma's earthquake swarms. "[The] majority of recent earthquakes in central and north-central Oklahoma are very likely triggered by the injection of produced water in disposal wells." [SAC ¶ 57 (quoting the Okla. Sec. of Energy and Environment)]. "'Wastewater injection is undoubtedly responsible for the majority of these earthquakes.'" [SAC ¶ 13 (quoting USGS scientist)]. EPA agrees that injection causes earthquakes. [SAC ¶ 56]. Beyond that, scientists have already established a causal link between specific injection wells and specific earthquakes such as the Prague and Fairview swarms [SAC Ex. 13, 15 and ¶¶ 55, 73, 91]. In the case of Fairview, the wells causing that MM 5.1 were as much as 20 or even 30 km (12 – 19 miles) away from the earthquake. [SAC Ex. 16, p.2 (figure at the top of the page shows the "high-rate injection zone" with the cluster and the MM 5.1 earthquake and the distances can be seen by reference to the scale shown on the map)]. Plaintiffs' allegations more than establish general causation.

### B. Specific Causation Has Also Been Sufficiently Pled

The Court found that the allegations in the First Amended Complaint did not meet the requirements of specific causation. That is, they did not plead "exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her" is required. *Robbins,* 519 F.3d at 1250. This deficiency has been cured in the SAC. The SAC now identifies Plaintiffs' allegations as to who did what to whom. The allegations connecting each Defendant to particular earthquakes and those

earthquakes to Plaintiffs' damages are sufficient to "nudge" Plaintiffs' claims across the line from conceivable to plausible. *Id.* at 1247.

Other than Range, Plaintiffs allegations have the following common outline clearly establishing a causal link from the Defendants' wrongful conduct to the harm suffered by Plaintiffs. For illustrative purposes, the allegations regarding Chesapeake are discussed, but the same analysis applies to the alleged facts for all Defendants other than Range. Defendant Chesapeake operates more than 30 wells in Western Oklahoma including Campbell 1, Dutch Harbor 1-14, and Mississippi 1 injecting wastewater into the Arbuckle formation. [SAC ¶¶ 16, 18, and 92]. In "response to past [earthquake] activity, but also to get out ahead of it and hopefully prevent new areas from being involved," the OCC required reduction of rates or monitoring of 36 wells operated by Chesapeake. [SAC Ex. 1, pp.1 and 2]. Chesapeake's injection activities place them in the upper quartile of injection well disposal volume, within 10 miles of an earthquake or otherwise of special interest. [SAC ¶ 92]. Defendant Chesapeake primarily caused the Fairview / Cherokee earthquake swarm occurring November 2015 – February 2016 and including a MM 5.1 earthquake by their wastewater injections via a mechanism of far-field pressurization. [SAC ¶¶ 90, 91, 92 and Ex. 16]. The Fairview / Cherokee earthquake swarm damaged real and personal property in the area and interfered with the use and enjoyment of real property. [SAC ¶ 94]. Plaintiffs Auburn and Douglas Cloyes suffered damage from the Fairview/Cherokee earthquake, and it interfered with their use and enjoyment of their property. [SAC ¶ 34, 93]. The Fairview / Cherokee swarm caused shaking in multiple

Oklahoma cities sufficient to interview with other named Plaintiffs' and class members property including in Edmond, Stillwater, and Cushing. [SAC at Fig. 15].

The same basic outline of allegations was made against each Defendant other than Range. These allegations are the specifics regarding "exactly *who* is alleged to have done *what* to *whom,* [sufficient] to provide each individual with fair notice as to the basis of the claims against" them. *Robbins,* 519 F.3d at 1250. The specifics regarding what well operated by a Defendant caused which earthquake and which of the Plaintiff(s) that earthquake damaged are new allegations in the SAC. These allegations plausibly allege that each of these specific Defendants, not just the oil and gas industry writ large, caused specific earthquakes which harmed specific named Plaintiffs.

### 1. Plaintiffs Are Not Required to Establish Specific Wells Caused A Particular Earthquake or Swarm, Though Plaintiffs Made That Type of Allegations

Defendant Sandridge argues that Plaintiffs are required to establish which specific well caused a particularly earthquake. [Doc. 281, p. 9-10]. Oklahoma's Constitution guarantees a "certain remedy afforded for every wrong and for every injury to person, property, or reputation." Okl. Const. Art. II, § 6. Thus, Oklahoma law allows a Plaintiff to seek recovery against *all* parties whose wrongful acts cause injury to Plaintiff. But, despite Defendants assertions, Plaintiffs are not required to ultimately prove which specific action of the specific defendant caused the harm. In *British-American Oil Producing Co. v. McClain*, 1942 OK 89, 126 P.2d 530, the Court allowed Plaintiffs to sue numerous oil and gas companies for damages caused by drilling operations on adjacent lands. *Id.* at ¶ 1. *McClain* alleged two causes of action, that Defendants' drilling operations caused

annoyance and inconvenience to Plaintiffs, and the drilling operations also caused real property damage. *Id.* Plaintiffs obtained a verdict on both causes of action. *Id.* On appeal, defendants challenged the fact plaintiffs did not prove the defendants were common operators of the oil and gas wells, and there was no "concert of action" among the defendants that caused the injury. *Id.* at ¶ 4. Instead, the defendants argued they should be liable only for their portion of damages. *Id.* The Court disagreed and allowed plaintiffs to sue all the Defendants jointly for alleged damaged caused by their oil and gas operations. *Id.* at ¶ 9. Relying on *Northup v. Eakes*, 1972 OK 66, 178 P. 266, the Court stated that Defendants' oil and gas operations that contributed to the damage of Plaintiffs' property may be sued jointly, even if there was no "concert of action" to brand them as "actual joint tortfeasors." *Id.* at ¶ 5.

The Court used similar reasoning in *Town of Sentinel v. Boggs*, 1936 OK 620, 61 P.2d 654. In that case, plaintiffs' property was damaged from toxic gases that leaked from the City's sewage system and storage tanks from a local slaughterhouse. *Id.* The plaintiffs alleged, *inter alia,* the City's sewage system was a nuisance but did not sue the slaughterhouse. *Id.* at ¶ 2. The jury found for plaintiffs, and defendants appealed, arguing that the toxic gases emanated from the slaughterhouse, so they should not be liable. *Id.* at ¶ 20. Ultimately, the Court ruled that even if the gases originated at the slaughterhouse, the fact the odors commingled and caused damage to plaintiffs was sufficient to hold defendant City liable. *Id.* at ¶ 21.

The holding in *Phillips Petroleum Co. v. Vandergriff*, 1942 OK 94, 122 P.2d 1020 is similar to *British-American Oil Producing Co.*, where plaintiffs sued an oil and gas

company for damage to their real property caused by vibrations from defendant's oil and gas operations. *Id.* at ¶ 3. There were other factories and oil wells that may have caused the damage to plaintiffs' property. *Id.* *Phillips* held that even if damage had been caused in part by other parties, it was sufficient if the evidence showed plaintiff sustained damage from defendant's oil and gas operations.

Oklahoma law clearly does not require Plaintiffs to allege exactly which of Defendants' oil and gas wells caused the specific earthquakes damaging Plaintiffs' property. There is simply no precedent to support that position. Without citing any case law to support its position, Defendant Sandridge argues Plaintiffs did not allege which specific Sandridge well caused a specific earthquake. As with the plaintiffs in *British-American Oil Producing Co., Northup, and Boggs*, the Plaintiffs here only need to allege the Defendants' oil and gas operations were a cause of the earthquakes that damaged Plaintiffs' property. This Plaintiffs have done, and Plaintiffs have gone further. Plaintiff alleged the specific wells that caused specific damage to named Plaintiffs.

### 2. Plaintiffs Are Not Required to Establish That a Particular Fault Caused a Particular Earthquake

Defendant White Star argues that Plaintiffs must point to a specific *fault* as the culprit in causing any of the earthquakes. [Doc. 279, p. 7]. Given the analysis above regarding specific wells, this argument is similarly wrong. Defendants stated "(1) Pre-existing faults that could permit pressure communication between the Arbuckle and the granite basement are an essential aspect of Plaintiffs' claims—*i.e.*, in the absence of faulting along which slippage in the granite may be induced by pressure in the Arbuckle,

the seismic events of which Plaintiffs complain cannot have been induced by any Defendant." [Doc. 279, p.3]. That horse is out of the barn. Plaintiffs alleged that the science on point is clear. The faults exist, and Defendants' wastewater injected into the Arbuckle communicates with the faults inducing earthquakes.

Defendant White Star focuses on needing the name and location of the pre-existing faults from whence earthquake originates and now asks the Court to do some mental gymnastics to make the name of the faults at issue the central focus for causation and plausibility. Injecting wastewater into to the Arbuckle formation increases the pressure inside the formation. [SAC ¶ 41]. This increase in pressure generally radiates radially from the point of injection to a fault. [SAC ¶ 41]. The pressure caused by injections alters stresses that hold the faults together, letting them slip, unleashing an earthquake. [SAC ¶ 52]. The "fault" contains the earthquake potential but without the Defendants' action of injecting wastewater, the earthquake would not have occurred when they did. The existence of the faults is like a rock perched on a hill above a house. Defendants have done the equivalent of pushing the rock down the hill causing damage to Plaintiffs' houses. Naming the boulder is not important, but noting that it previously rested peaceably above the house, and Defendants sent it tumbling down, is the point.

Additionally, White Star argues that "(2) because any fault which slips may be…"some distance from the injection point," there is no necessary correlation between the location of an injection well and the hypocenter of any earthquake. [Doc. 279, pg. 3-4]. Defendants concluding that "no necessary correlation between the location of an injection well and the hypocenter of any earthquake" exists. [Doc. 279, pg. 3-4]. Plaintiffs

do not, at this juncture, have to definitively *prove* causation, they must merely show plausibility. Scientists have generally used the distance from the injection point, volume, and injection rate to tie injection wells to a cluster of earthquakes. [SAC ¶41 ("water injected by Defendants increases the water pressure in the Arbuckle formation, and…radiates out generally in [a] circle from each injection well")], [SAC Ex. 3, p.1 ("plan calls for disposal wells injecting into the Arbuckle formation to change operations based on the distance from the center of the recent earthquake activity")] and [SAC Ex. 24, p.2 ("the distance over which injected fluids have affected surrounding faults is limited to the size of the areas analyzed…(~50-km radius around a well)")]. In weighing the plausibility of the allegations, the Court should not ignore the science logically indicating that the closer a well is to the earthquake, the more likely that well <u>caused</u> the earthquake.

Defendant White Star takes pot shots at the scientific conclusion that wastewater injection is very likely the cause of Oklahoma's recent earthquake swarms. White Star asks the Court to take judicial notice of the fact that the USGS reports the hypocenter of the Cushing seismic event at a depth of 14,400 feet beneath the surface —thousands of feet greater than the intersection of the Arbuckle and the granite basement. [Doc 279 pg.2 n.3]. Defendant White Star concludes that "fact, alone, makes disposal of water into the Arbuckle by <u>anyone</u> an exceptionally unlikely cause of the Cushing earthquake." [Doc 279 pg.2, n.3]. White Star also makes a hard-to-follow analogy to a buried car wreck, stretching a car accident hypothetical from *Robbins* beyond its breaking point. [Doc. 279, p. 7-8]. Plaintiffs have alleged facts explaining why Defendants' injection can cause earthquakes at significant distances from the injection point. [SAC ¶50]. However, at the

end of the day, the extremely strong scientific consensus is that Defendants are causing earthquakes by injecting wastewater,[7] and Defendants' random musings and quirky analogies do nothing to change that consensus.

### 3. Defendants Have Done More than Merely Create a "Condition" that Risks Harm to the Plaintiffs

Three Defendants cite to *Billy v. Tex., O. & E.R. Co.,* 1953 OK 280, 263 P.2d 187, to suggest that their actions only furnish a "condition by which the injury was possibly and a subsequent independent act caused the injury. . ." *Id.* at 190.[8] [Doc. 289 (EastOk), p. 8; Doc. 278 (Devon), p. 5; Doc. 282 (Phoenix), p. 6]. This theory requires, of course, some intervening act to break the causal connection between Defendants' wastewater injection and the earthquakes. OUJI 9.8 states that to establish an "intervening" act, that action must be a) independent of defendants act or omission; b) adequate by itself to cause plaintiff's injury; and c) not reasonably foreseeable by Defendants. Defendants do not identify an intervening act. In *Billy*, the intervening act was plaintiff's negligent failure to maintain his own brakes. No such possibility exists in this case that Plaintiffs can or will cause an earthquake or do anything to hasten its arrival.

---

[7] "[The] majority of recent earthquakes in central and north-central Oklahoma are very likely triggered by the injection of produced water in disposal wells." [SAC ¶ 57 (quoting the Okla. Sec. of Energy and Environment)]. "'Wastewater injection,' says Bill Ellsworth, a seismologist at the USGS, 'is undoubtedly responsible for the majority of these earthquakes.'" [SAC ¶ 13].

[8] In the *Billy* case the court found that a railroad's failure to trim the brush near a railroad crossing to keep sight lines clear and failure to sound a horn or whistle at a crossing merely created a condition but that the failure of the driver of the vehicle to properly maintain their brakes was the true *proximate* cause of the accident. *Id.*

## V.     Plaintiffs Have Sufficiently Pled Legally Available Damages

Defendants take issue with Plaintiffs' allegations of what damages are recoverable and from whom.  Their arguments are primarily that Plaintiffs' allegations, if accepted, would result in some "collective" or "market share" liability on the part of the Defendants. For example, White Star and Chesapeake make similar arguments stating that "the collective liability issue remains (between the four), with no attempt by Plaintiffs to establish which Defendant or well is responsible for some or all of the earthquakes." [Doc. 287, p. 9].  Each Defendant relies upon *Case v. Fiberboard Corp.*, 1987 OK 79, 743 P.2d 1062, which rejected market-share liability in asbestos litigation.  *See, e.g.* [Doc.285, p. 13].  Defendants are conflating specific causation in this analysis with damage calculations. Setting aside the applicable pleading standard, proving liability of a Defendant is quite different from establishing the amount of damages due to a Plaintiff and from whom they are due.

The asbestos litigation had numerous problems and distinctions not present in this case.  For example, the plaintiff in *Case* did not know which of the defendants had sold the asbestos products that sickened him.  Although it was accepted that asbestos caused harm, *Case* had little choice but to attempt to apportion liability to the defendants in proportion to their share of the relevant market generally.  The Court rejected this, finding that a plaintiff must show "a causative link proven between that defendant's specific tortious acts and the plaintiff's injuries" and must show "that there was a significant probability that those acts were related to the injury." *Case*, 1987 OK at ¶10.

In this case, Plaintiffs know precisely who is involved in the negligent acts. There are databases showing where and how much Defendants injected. This distinction is significant. To some extent, the defendants in *Case* were being sued for their *status* or *position* in the asbestos industry chain. That position was not, according the court, strong enough to impose liability upon any particular defendant. In contrast, Plaintiffs bring their claims against these Defendants for their *actions,* to wit: their known wastewater injections. Here, Plaintiffs have shown that each of the Defendants' specific tortious act – wastewater injection to the Arbuckle formation – have a significant probability of being connected to the earthquakes that caused damages to Plaintiffs. *Case* thus does not bar Plaintiffs' recovery.

In *Northup v. Eakes*, 1918 OK 652, ¶ 3, 178 P. 266, 267 numerous defendants allowed oil to flow to a stream upstream from Plaintiff's barn. The oil collected in the stream near the barn and ignited. *Northup* held that while the defendants acted independent of each other, their several acts in permitting the oil to flow into the stream combined to produce but a single injury. In these circumstances each is responsible for the entire result, even though his act or neglect alone might not have caused it. *Id.* Analogous to *Northup,* the Defendants independently injected wastewater, and their injections combined to cause Oklahoma's earthquake swarm. In that case there were two separate defendants who put crude oil into a stream that flowed down onto the plaintiff's property and ignited and caused a fire. The plaintiffs in that case could not specifically prove necessarily what percentage of the crude oil was Defendant A and what percentage was Defendant B, but it was the contribution of both defendants placing the crude oil into the water that eventually caused

the oil to land on plaintiff's property and ultimately caused a fire which burned the plaintiff's barn.

The issue of *how* liable a Defendant is with respect to a particular claim – even in cases with multiple defendants – is a question for the jury – at a much different procedural point in the case. Defendants are confusing their ability to be sued with the amount of their liability. Their ability to be sued as a Defendant for *specific actions as alleged,* should not be questioned. What percentage or amount of liability will be imposed upon them is for the jury to decide after hearing all of the evidence describing Defendants' discrete actions and Plaintiffs' discrete claims for damages.

Oklahoma law has disposed of joint liability and thus, Defendants will no longer be lumped together on the verdict form. In fact, the instructions and verdict forms in OUJI 9.34 and OUJI 9.36 are clear that the jury must "fill in some percentage of negligence" for any or all Defendants (OUJI 9.34), or if applicable, for any or all Defendants or any non-party (OUJI 9.36).[9]

## A. Plaintiffs Can Recover for Damages That Occurred Before They Owned the Real Property at Issue

Defendant Devon argues that Plaintiffs Auburn and Douglas Cloyes did not own the subject property at the time the earthquakes occurred and are thus barred from recovering damages to that property. [Doc.278, p. 8-10]. This is not the case. In *Fischer v. Atlantic Richfield Co.*, 774 F. Supp. 616 (W.D. Okla. 1989), landowners filed suit against an oil and

---

[9] Several Defendants briefly allude to "unnamed" parties (defendants). Although no motion to join indispensable parties has been made as contemplated by Federal Rules of Civil Procedure 19 and 23.

gas company alleging nuisance caused by pollution from defendants' operations. Defendants argued plaintiffs had no cause of action for pollution damage because the damage occurred prior to their ownership, and the purchaser of the land "takes the land as he finds it, subject to any pre-existing depreciation due to nuisance." *Id*. at 619.

*Fischer* allowed plaintiffs' claims because the injury was caused by a permanent private nuisance and not a temporary private nuisance. *Id*. at 619. Similar to the claims at bar, the plaintiffs alleged damages that were temporary and continuing in character, so plaintiffs could seek a cause of action for private nuisance relating to pollution damage to their land even though the plaintiffs did not own the land at the time. *Id*. *Fischer* also reasoned that to the extent the defendant's oil and gas operations caused a public nuisance then the defendant's alleged "coming to the nuisance" doctrine does not apply. *Id* at 620. Most notably, *Fischer* held that there is "no such thing as a prescriptive right to maintain a public nuisance." *Id*.

Additionally, under Oklahoma law, a plaintiff only needs to have a possessory interest and/or property right to bring a nuisance cause of action. In *Nichols v. Mid Continent Pipe Line Co*., 1996 OK 118, 933 P.2d 272, a sublessee brought a nuisance and negligence action against an oil and gas company. Plaintiff alleged defendant's oil and gas operations released hydrocarbons that damaged the plaintiff's land and cattle. *Id*. at ¶ 4. Of note, some of the defendant's oil and gas operations that caused the hydrocarbons to leak occurred prior to plaintiff leasing the property. *Id*. at ¶ 3. Defendant argued plaintiff was not entitled to plead a nuisance cause of action since he had no possessory interest in the land as a sublessee. *Id*. at ¶ 9. The Court disagreed. *Id*. at ¶ 11. The Court noted the

plaintiff as possessor of land fell within the class of claimants that can bring a private nuisance action. *Id.* Citing RESTATEMENT (SECOND) OF TORTS § 821D, the Court stated a private nuisance claimant can recover for "personal harm, inconvenience and annoyance incidental to another's interference with the possessory interest in land." *Id.* The Court had no requirement or made no mention the plaintiff must have the possessory interest at the time the wrongful acts occurred.

Defendants make the same argument offered in *Fischer,* to wit: the Cloyes' claims fail because they did not own the property at the time of the 2013-2014 Edmond earthquake. As discussed above, this argument is flawed, and Oklahoma law does not preclude the Cloyes' claims.

### B. Plaintiffs May Recover Insurance Premiums in Addition to Other Damages

Oklahoma law has not specifically addressed whether insurance premiums are recoverable. That said, under Oklahoma law, a plaintiff alleging nuisance and negligence can recover ***all*** damages for personal injury as well as damages to property. *See Truelock v. City of Del City*, 1998 OK 64, 967 P.2d 1183. Specifically, the Court has held that injuries related to inconvenience, annoyance and discomfort in a nuisance suit are injuries to person and separate and distinct from damages to real property. *See Ponca Tribe of Indians v. Cont'l Carbon Co.*, 2008 U.S. Dist. Lexis 123678 n.1, (W.D. Okla. November 21, 2008); *Okla. City v. Tytenicz*, 1935 OK 433, 43 P.2d 747; *Okla. City v. Eylar*, 1936 OK 614, 61 P.2d 649; *City of Holdenville v. Kiser*, 1937 OK 29, 64 P.2d 1223; *Phillips Petroleum Co. v. Ruble*, 1942 OK 93, 126 P.2d 526; and *Town of Braggs v. Slape*, 1952 OK 396, 250 P.2d 214. While these damages do not increase the overall property award,

they allow a plaintiff to be compensated for an entirely different injury, one necessary to make the plaintiff whole. *See Ponca Tribe of Indians*, 2008 U.S. Dist. Lexis 123678 n. 1.

In addition to their nuisance claims, Plaintiffs have also pled negligence. It is well settled that actions based on tort, i.e. negligence, allow a plaintiff to recover *any* damages proximately caused by the wrongdoer. *See Brennen v. Aston,* 2003 OK 91, 84 P.3d 99, and *Overturff v. Hart*, 1975 OK 13, 531 P.2d 1035. Damages from tort actions are codified under 23 O.S. § 61 (emphasis added), which provides that:

> for the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for **all detriment** proximately caused thereby, whether it could have been anticipated or not.

Detriment is defined as "a loss or harm suffered in person or property." 23 O.S. § 4; *see also LeFlore v. Reflections of Tulsa, Inc.*, 1985 OK 72, 708 P.2d 1068. This recovery allows for an injured party to receive compensation for "**any** pecuniary loss." *Denco Bus Lines, Inc. v. Hargis*, 1951 OK 11, ¶ 11, 229 P.2d 560n (emphasis added). *Denco* made clear it will not disturb or disallow alleged damages if there is evidence to support the claim. *Id.* at ¶12. It is the job of the jury to determine whether the alleged damages are appropriate. *Id.*; s*ee also Estrada v. Port City Properties*, Inc., 2011 OK 30 ¶ 35, 258 P.3d 495, 508 (damages is a jury question). The court will only get involved if the amount of recovery "bears no relation whatever to the evidence." *Id.* (*quoting Pub. Serv. Co. of Okla. v. Hawkins*, 194 OK 272, 149 P.2d 783).

One of the cases Defendants rely on for their argument is *Schneberger v. Apache Corp.*, 1994 OK 117, 890 P.2d 847. In *Schneberger*, the plaintiffs reached a settlement

agreement with defendants to abate pollution caused by oil and gas operations. *Id.* Defendants breached the settlement agreement, and plaintiffs filed a complaint against defendants for breaching the settlement agreement. *Id.* at ¶8. As such, the *Schneberger*'s ruling was limited to the damages recoverable as a result of defendants' breach of the settlement agreement. *See Id.* at ¶ 21. The issues of tort, such as negligence and nuisance, were not included, thus this case is distinguishable from the issues at hand. The same was true for the other cases the Defendants' cited. These cases focused on determining the damages related to restoring damaged property and did not take into account the damages related to negligence and personal inconvenience, annoyance and discomfort.

Conversely, *Phillips Petroleum Co.*, 1942 OK 93, is more closely related to the facts and allegations in this case. In *Phillips Petroleum Co.*, the plaintiff filed suit against defendant power plant alleging vibration and noises of the engines created exhausts that caused a nuisance. *Id.* at ¶ 3. The plaintiff alleged two causes of action: damage to real property; and damages for personal inconvenience, annoyance and discomfort. *Id.* at ¶ 2. Plaintiff obtained a jury verdict on the cause of action related to personal inconvenience, annoyance and discomfort. *Id.* at ¶4. Defendant appealed and argued plaintiff should only be allowed to obtain damages related to the depreciation in value of the property damaged by the nuisance. *Id.* at ¶ 10. The *Phillips'* Court disagreed, noting they cannot change an injury to person into one to property "by so denominating it." *Id.* at ¶11. The Court opined quite eloquently, stating "a broken arm would not be called an injury to personal property because it was fractured in an automobile collision when the injured person was using his own automobile." *Id.* The same is true for the Plaintiffs in this case. Simply because

Plaintiffs suffered property damage as a result of the earthquakes does not limit them to recovery for damage to their property. In other words, Plaintiffs are not barred from alleging all damages that occurred because of or proximately caused by the earthquakes.

Defendants also incorrectly argue Plaintiffs are not entitled to allege insurance premiums as damages because they were "voluntarily" paid. [Doc. 282, p.8]. None of these cases cited by defendants, however, involved the payment of insurance premiums, particularly to a third-party not involved in the lawsuit. Additionally, it seems a bit disingenuous to categorize Plaintiffs' payments for these insurance premiums as "voluntary." Plaintiffs would have no need for earthquake insurance *but for* the actions of the defendants. There was no need for these premiums until the time Defendants' actions caused the earthquakes.

Defendants arguments suggest Plaintiffs only options are to not carry insurance and be stuck with paying out of pocket expenses, which could be astronomical; or pay insurance premiums, with high deductibles, to cover the damages certain to be caused by the earthquakes. It defies economic logic to criticize a Plaintiff who takes prudent steps to protect themselves, and to in fact, *mitigate* their financial damages. To punish the responsible Plaintiffs who are cautious enough to have the means to secure insurance would be an injustice. It is certainly not fair to allow the Defendants to prosper from their wrongful acts *and* pass the buck to the injured parties by having them pay earthquake insurance premiums; but in the same breath call these premiums "voluntary." Being forced to pay for something that would not be necessary if it were not for the wrongful act of another is far from voluntary.

While Oklahoma law has not specifically ruled on the issue related to the recovery of insurance premiums, Plaintiffs find little support for the *exclusion* of them as a recoverable element of damages. The Court could certainly determine recovery of earthquake insurance premiums are a "detriment" caused by the Defendants' actions. Based on Oklahoma's liberal view of allowing juries to determine damages, insurance premiums should be recoverable if plaintiff provides evidence to support such a claim. Despite the fact Defendants continually point out in their briefs that Plaintiffs have not *proven* the allegations which is simply not the case, it really would not matter because *proof* is not required at the initial pleading stage. The standards applicable to a motion to dismiss show clearly that Oklahoma courts are more willing to allow a cause of action, including all alleged damages, to proceed past the initial pleading, so the parties may conduct discovery, revealing the factual heart of the matter.

Here, Plaintiffs' have sufficiently pled facts to support a claim for insurance premiums related to the Defendants' wrongful acts. *See Plaintiffs' Second Amended Complaint.* [Doc. 272, ¶ 67] Dismissing these damages without any benefit of discovery would be improper. Accordingly, Defendants' Motion to Dismiss and/or Strike Plaintiffs' damages related to earthquake insurance premiums should be denied.

## VI. Conclusion

Defendants move the Court to dismiss the negligence claims asserted against them in Plaintiffs' SAC. Although they weave a number of arguments over and around the real issue, there is *only one* issue to review: have the Plaintiffs' amended their claims to include *specific* causation? Have they made enough *factual allegations* to suggest it is *plausible*

Defendants' actions were negligent, and caused harm to the Plaintiffs? Disguising the issue as a question of damages or market share liability or even a loathing of the class action allegations does not change it; nor does it make it more grandiose or foreboding. The analysis requires only a review of Plaintiffs' SAC and a determination of whether the claims made by Plaintiffs – looking at the words themselves – are plausible. Nothing more, nothing less.

Defendants' hope is that their smoke and mirrors showcase paints a picture of an impossible task, to wit: litigating Plaintiffs' claims. They deny and attack the science, even though it is well accepted. They ignore paragraph after paragraph of allegations in the SAC describing each Defendants' actions.

In this objection and response, Plaintiffs offer the Court nearly ten pages in summary of the *factual allegations* brought against Defendants. In fact, those ten pages are broken down by *Defendant* – identifying the specific language in the Second Amended Complaint that *describes* what Plaintiffs allege that each Defendant did wrong; and the harm those actions caused to each Plaintiff. That type of specificity should suffice under any pleading standard. The Court should not disregard the minutiae offered by Plaintiffs to justify moving this litigation forward. The harms being inflicted upon Oklahomans are simply too great to ignore.

WHEREFORE, Plaintiffs respectfully request that Defendants' Motion to Dismiss be DENIED in their entirety.

Respectfully submitted,

*/s/Edward L. White*

Edward L. White, OBA #16549
Kerry D. Green, OBA #31998
Edward L. White, P.C.
829 East 33rd Street
Edmond, Oklahoma 73013
Telephone: (405) 810-8188
Facsimile: (405) 608-0971
Email: ed@edwhitelaw.com
    kerry@edwhitelaw.com

-And-

*/s/ Ray Maples*

Ray Maples, OBA #18586
Glendell Nix, OBA #13747
Nicole Snapp-Holloway, OBA #18472
Maples, Nix & Diesselhorst, PLLC
15401 North May Avenue
Edmond, Oklahoma 73013
Telephone: (405) 478-3737
Facsimile: (405) 513-5005
Email: ray@mndlawfirm.com
    glendell@mndlawfirm.com
    nicole@mndlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

       This certifies that on November 3, 2017, I electronically transmitted the above document to the Clerk of the Court using the CM/ECF system for filing and service on:

| | |
|---|---|
| April B. Coffin | abcoffin@gpmlegal.net |
| Ashley L. Powell | apowell@hartzoglaw.com |
| Bradley W. Welsh | bwelsh@gablelaw.com |
| Briant T. Inbody | binbody@mcnamlaw.com |
| Dale E. Cottingham | dcottingham@gablelaw.com |
| Daniel V. Carsey | dcarsey@rischardlaw.com |
| David L. Kearney | dkearney@dlb.net |
| Drew Neville, Jr. | dneville@hartzoglaw.com |
| Eric L. Huddleston | ehuddleston@eliasbooks.com |
| J. Todd Woolery | todd.woolery@mcafeetaft.com |
| Joseph M. Vorndran | joe@stuartclover.com |
| Kelly K. Basey | baseylaw@gmail.com |
| Patrick L. Stein | patrick.stein@mcafeetaft.com |
| Robert G. Gum | rggum@gpmlegal.net |
| Timothy J. Bomhoff | Tim.Bomhoff@mcafeetaft.com |
| William K. Elias | wkelias@eliasbooksbrown.com |
| Wyatt D. Swinford | wswinford@eliasbooks.com |
| Jack A. Mattingly, Sr. | jacksr@mroklaw.com |
| Katherine T. Loy | dlb@dlb.net |
| Michael L. Darrah | dlb@dlb.net |
| Lane R. Neal | dlb@dlb.net |
| E. Edd Pritchett, Jr. | dlb@dlb.net |
| Harry E. Brown | brownlaw@cox.net |
| James T. Stuart | jim@stuartclover.com |
| Jodi C. Cole | Jodi.cole@mcafeetaft.com |
| John J. Griffin, Jr. | griffinj@crowedunlevy.com |
| Kevin Chang | kevin.chang@kirkland.com |
| Kiran A. Phansalkar | kphansalker@cwlaw.com |
| L. Mark Walker | walkem@crowedunlevy.com |
| Leah T. Rudnicki | lrudnicki@hallestill.com |
| Lewis T. LeNaire | llenaire@gablelaw.com |
| Mark McKane | mark.mckane@kirkland.com |
| Michael E. Smith | mesmith@hallestil.com |
| Michael P. Esser | Michael.Esser@kirkland.com |
| Mitchell D. Blackburn | mblackburn@cwlaw.com |

*/s/Edward L. White*